NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250464-U

NO. 4-25-0464

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 13, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ALFRED ROLAND WALKER, | ) | No. 17CF645 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Steigmann and Justice Vancil concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) The totality of the evidence adduced against defendant at the bench trial was so substantial that trial counsel's missing an opportunity for impeachment caused no prejudice to the defense, and, thus, in his amended petition for postconviction relief, defendant failed to make a substantial showing of ineffective assistance.

(2) By omitting, in the amended petition, claims that defendant never raised in his *pro se* petition, postconviction counsel did not breach his duty under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) to "ma[k]e any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of *petitioner's* contentions"—and even if defendant did raise the *pro se* claims in question, postconviction counsel could have reasonably abandoned them as spurious. (Emphasis added.)

¶ 2   Defendant, Alfred Roland Walker, who is serving sentences of imprisonment for

home invasion (720 ILCS 5/19-6(a)(3) (West 2016)), armed robbery (*id.* § 18-2(a)(2)),

aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and aggravated discharge of a firearm (*id.*

§ 24-1.2(a)(2)), appeals an order of the McLean County circuit court granting the State's motion

to dismiss his amended petition for postconviction relief (see 725 ILCS 5/122-5 (West 2020)). The grounds of his appeal are twofold.

¶ 3        First, he contends that his amended petition made a substantial showing that trial counsel had rendered ineffective assistance by failing to impeach a witness for the prosecution, Darla Powell, with her prior statements to the police. In our *de novo* review, however, we conclude that the totality of evidence adduced against defendant was so substantial that trial counsel's failure to use this opportunity for impeachment caused no prejudice to the defense.

¶ 4        Second, defendant contends that postconviction counsel failed to fulfill his duty to make necessary amendments to the *pro se* petition for postconviction relief that defendant had filed. See Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Defendant complains that, in the amended petition, postconviction counsel abandoned two meritorious claims that were in the *pro se* petition. We do not read the *pro se* petition, however, as making those two claims in the first place, and in his drafting of the amended petition, postconviction counsel had no duty to raise new claims. And even if defendant did raise the claims *pro se*, postconviction counsel could have reasonably concluded they were frivolous and, thus, inadvisable for inclusion in the amended petition.

¶ 5        Therefore, we affirm the circuit court's judgment.

¶ 6                          I. BACKGROUND

¶ 7                  A. Darla Powell's Account of the Home Invasion

¶ 8        Darla Powell lived at 1528 Julie Drive, in Bloomington, Illinois, with her husband, Kevin Powell. (Most of our summary of the trial evidence comes from the appellate court's decision in defendant's direct appeal. See *People v. Walker*, 2020 IL App (4th) 180774, ¶¶ 4-37.) Around 6:30 p.m. or 6:45 p.m. on November 9, 2016, Darla was home alone when the doorbell

rang. (We hereinafter refers to the Powells by their first names to concisely distinguish them from one another.) She was not expecting any visitors. She turned on the porch light and asked who was there. " '[P]izza delivery,' " a man outside answered. Intending to tell the supposed deliveryman he had come to the wrong address, she opened the door.

¶ 9        Three men were standing inside the screen door. One of the men, who was holding a pizza box from Casey's General Store (Casey's), pointed a pistol at Darla's face and asked her where her husband was. She answered that he was not home. The three men then barged into the house. The man with the pistol told Darla, " ['S]it down here[,] Bitch.['] " She sat down on a swivel chair by the door. Using a roll of duct tape they had brought with them, the intruders taped her ankles together and taped her mouth shut. They also intended, apparently, to tape her hands together behind her back, but, instead, they taped her left hand into a fist, leaving her right hand free.

¶ 10        In her testimony, Darla described all three of the intruders as Black. The first man, the man "up front" with the pizza box and the pistol, had no mask on, and he had a darker complexion and a goatee and was wearing a black top and black pants. The second man, who had no mask on, either, had a lighter complexion and was wearing black pants and maybe a track jacket. These first two men were not much taller than Darla, who was five feet, four inches tall. The third man, also darker-complexioned, was taller than her and wore camouflage skinny jeans, a white shirt, and a ski mask that covered the bottom half of his face.

¶ 11        While one of the three men stood watch over Darla, the other two rifled through the contents of the house, asking her repeatedly where the money was. As they were tearing through the house, there was a bump in the basement. The furnace always bumped against the wall when

it turned on. One of the men ran up the hallway and said, " [']Mack, somebody is in the basement.['] " Darla assured them that no one was in the basement.

¶ 12         After the intruders searched the house, overturning things, one of them warned the other two that they had been there for about 20 minutes and had best be on their way. The intruders then loosened the tape from Darla's mouth and, holding her cell phone to her face, commanded her to persuade her husband to return home by telling him a lamp had fallen and broken. Kevin did not answer his phone.

¶ 13         Then Darla's mother called. While one of the men stood next to Darla with a pillow and a pistol, she told her mother she would call back.

¶ 14         Soon Kevin called back. Foreseeing that a broken lamp would be insufficient to induce him to come home, Darla told him, instead, that their big-screen television was falling off the wall.

¶ 15         As Kevin was on his way home, the three men carried Darla into the garage and shut her in the trunk of a car. While in the trunk, she heard three gunshots. Then she heard Kevin calling out to her, asking her if she was all right. She pulled the emergency release latch inside the trunk, got out, and went into the house. Kevin's face was face bloody, and he was elbowing himself along the kitchen counter.

¶ 16         Thinking that the intruders had taken her cell phone (it later was found, however, on a footstool in the house), Darla ran across the street and asked the neighbors to call 911. The 911 call was made at 7:39 p.m. on November 9, 2016.

¶ 17         On cross-examination, trial counsel asked Darla:

> "Q. *** You, of course, sit here today hoping for a conviction, correct?
>
> A. Yes.

"Q. Earlier you said that now you do think that [defendant] was in your home, correct?

A. Once I seen a description of the clothing, yeah.

Q. So once you talked to the detective and had an interview with him, you came around to the fact that [defendant] was in your home, correct?

A. Yeah. That's when I did, yeah."

¶ 18    Trial counsel also asked her:

"Q. So you're here hoping some kind of justice or conviction is gathered. Correct?

A. Yes."

¶ 19                B. Darla's Tentative Identification of Jamal Parks

¶ 20    On March 9, 2017, Detective John Atteberry interviewed Darla at the Bloomington Police Department. He had interviewed her before. In this further interview, she told Atteberry that one of the intruders had "looked a lot like" someone she knew who was named Isaiah (but who, she "learned later," "had nothing to do with this," to quote her testimony). Atteberry showed her a photograph of a man who, she assumed from her conversation with Atteberry, "was someone who they thought was in the home." When shown the photograph, Darla told Atteberry, "[T]hat looks like him[,] but I want to be sure."

¶ 21    Atteberry testified that, in that further interview, he showed Darla a photograph of Jamal Parks.

¶ 22                C. Kevin's Account

¶ 23 Kevin testified that he was in the car-detailing business and that he owned two shops, side by side, around the corner from where he and his wife lived. He had a conviction, from 2010, for dealing cocaine, but he had reformed himself (he smoked only marijuana), and now his passion was cleaning cars. (When responding to the incident, the police noticed a smell of fresh and burnt marijuana in the house, but they saw only a minimal amount of marijuana, consistent with personal use.) Commonly, Kevin worked at his car-detailing business seven days a week. On November 9, 2016, he went to work, as usual. Around 7 p.m., just as he was leaving JJ's Fish & Chicken, he received a phone call from his wife asking him to come home because the television was falling off the living room wall.

¶ 24 So, Kevin came home, and as he was walking up the driveway, he was approached by three men wearing masks and armed with pistols. They rushed him into the house. The apparent ringleader demanded from him a specific sum, $40,000, pistol-whipping him and telling him, " 'We know you got it. You got them shops right around the corner.' " But Kevin did not have $40,000 in the house. Not even in his drug dealing days did he have that kind of money lying around.

¶ 25 The intruders wanted to know where the money was. The ringleader tried, futilely, to beat the information out of Kevin, but he was unable to give up what he did not have. Getting hit in the face and head with the butt of a pistol caused him to fall onto the living room couch. One of the men then duct-taped his ankles together. Kevin had his work hoodie on, with the hood down, and the man who had pistol-whipped him picked up a pillow and told him to cover his head with his hood. Perceiving that the plan was to shoot him in the head, Kevin refused to cooperate with his own execution. He stood up from the couch, saying, " 'If You're going to shoot me, you're going to have to shoot me to my face.' " One of the three intruders remarked to Kevin that he was

tough, whereupon they opened fire on Kevin—three shots, one after another—shooting him in the leg and the arm. He fell to the living room floor, and the intruders ran out of the house, taking his cell phone with them.

¶ 26　　　On June 13, 2017, Kevin went to the Bloomington Police Department for an interview, where he was shown a photographic array. He circled one of the photographs simply because he recognized the person in that photograph. It was a man whom he knew as " 'Big Mack' " or " 'Fat Mack.' " He knew this man as a friend of his brother-in-law. About three months before the incident, he saw Fat Mack in a Kreg Therapeutics truck, next door to the shops. He flung up his arm, and Fat Mack flung up his arm. Big Mack or Fat Mack was defendant, and Kevin identified him as such in court. Kevin did not know, in the police station, that the purpose of the photographic array was to identify the perpetrators. He just thought the purpose was to identify people whom he recognized. Initially, it did not occur to him that defendant was one of the men who had invaded his home. But after watching a surveillance video from Casey's, which showed defendant buying a pizza from Casey's and wearing the same black clothing that one of the intruders had worn, Kevin was convinced that defendant had, in fact, been one of the masked intruders—because the clothing matched. The night of the incident, however, Kevin did not think, " '[Defendant is] in my home.' "

¶ 27　　　　　　D. Fingerprints on the Casey's Pizza Box

¶ 28　　　The Casey's pizza box that the intruders had used as a prop to gain entry into the Powell residence was left behind on the living room couch. The fingerprints of both defendant and Parks were found on the pizza box.

¶ 29　　　　　　E. Defendant's Account to the Police

¶ 30　　　In June 2017, after months of investigatory work, the Bloomington police arrested

defendant on a warrant. They took him to an interview room at the police station, and after they read him his rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), he agreed to answer their questions. The interview was recorded on video (People's exhibit No. 29), which the prosecutor offered into evidence.

¶ 31 Both the prosecutor and trial counsel were of the view that the video should be admitted into evidence, although, the prosecutor noted, the interviewing police officers made some factual representations to defendant in the video that were inadmissible under the rules of evidence. Trial counsel specified that these representations were about how high defendant's bond was and the grand jury's issuance of a warrant for defendant's arrest. Otherwise, trial counsel mentioned no evidentiary problem with People's exhibit No. 29, which, in the absence of an objection, was admitted into evidence.

¶ 32 In this video exhibit, Atteberry was the primary interviewer, although, now and then, Detective Jared Roth and Sergeant Clayton Arnold also questioned defendant or interacted with him. Atteberry informed defendant that his (defendant's) fingerprint had been found on a Casey's pizza box left behind in a Bloomington house where, on November 9, 2016, a home invasion and shooting took place. Atteberry showed defendant some stills of a surveillance video of defendant buying pizza at Casey's on November 9, 2016, at 5:35 p.m., and Atteberry represented to defendant that he had obtained the cash receipt for the transaction. Defendant admitted it was he who was pictured in the stills. He thought that the Casey's was the one on Center Street or Main Street in Bloomington, but he was not accustomed to keeping track of where or what he ate months ago. He expressed bafflement to Atteberry ("This is crazy."), insisting he had no idea how the pizza box ended up in the residence.

¶ 33    Atteberry further disclosed to defendant that the fingerprint of Parks had also been found on this Casey's pizza box. Parks, Atteberry informed defendant, had recently died: he had killed himself in Chicago, Illinois, in a showdown with the police. Atteberry characterized Parks as having been a very dangerous man who would have killed anyone who looked askance at him and probably would have even killed for sport. Atteberry explained to defendant that Parks had been the ringleader of a rip-off crew from Chicago that robbed drug dealers of their money. It was Parks and his crew, Atteberry asserted, who had committed the home invasion in Bloomington, an incident in which a resident had been shot. Atteberry assured defendant that he was not the "dope cop," he could not have cared less about any drug trafficking that defendant might have been involved in, and all he cared about was the home invasion. He urged defendant to explain how his fingerprint ended up, alongside Parks's fingerprint, on the Casey's pizza box that was left behind in the residence—and not only that, but why, according to defendant's phone records, there were so many calls between defendant and Parks on November 8 and 9, 2016, whereas there were no calls between them previously.

¶ 34    Eventually, after further expressions of mystification, defendant gave Atteberry the following account (in the video-recorded interview, People's exhibit No. 29).

¶ 35    Although defendant bought the pizza at Casey's, as shown in the surveillance footage, it was not his cash that he used to buy the pizza. Rather, a light-skinned man, whom he knew only as "June" and whose last name he did not know, gave him the cash to go into Casey's and buy the pizza. June and another man, a darker-skinned man, had come from Kankakee, Illinois, to Bloomington. Upon arriving in Bloomington, June telephoned defendant, who lived on Roosevelt Avenue in Bloomington, and offered to buy cannabis from him. Defendant was in the business of selling cannabis to support his gambling habit. Because of this call from June,

defendant had June's number in his cell phone. They met on Market Street, and defendant rode around Bloomington in June's car, with June and his companion, passing a blunt around. Then June decided it was time to get something to eat, so he pulled into Casey's and sent defendant in for a box of pizza.

¶ 36      After defendant bought the pizza at Casey's with June's money, they resumed driving—June and his companion in the front seat and defendant in the back seat—eating pizza slices out of the box. About five minutes after they left Casey's, defendant was asked to show what he had to sell. When defendant pulled out the bags of cannabis, the darker-skinned man reached back in the car and struck defendant on the mouth with a pistol. Then, pointing the pistol at defendant's belly, he robbed defendant of his cannabis. Defendant was afraid he would be shot, but June pulled over at the Freedom gas station in Bloomington, and defendant got out of the car and ran.

¶ 37      Atteberry asked defendant if June was Parks, and, repeatedly in the interview, Atteberry showed defendant a photograph of Parks, who, supposedly like June, was light-skinned. Defendant steadfastly denied that June was Parks. He insisted he did not recognize this man, Parks, who was pictured in the photograph that Atteberry kept showing him.

¶ 38      Atteberry asked defendant to explain, then, why there were 19 phone calls between defendant and Parks on November 8 and 9, 2016. And there was something else that Atteberry wanted defendant to explain. Not only had Atteberry pulled defendant's phone records (he so informed defendant), but he also had "pulled the towers," and immediately after the shooting, defendant was "blowing up" Parks's phone from a location near the residence where the shooting took place. Defendant replied, however, that the phone he called was June's phone, not the phone of this Parks individual, and that he called June merely to threaten him with dire consequences

- 10 -

unless he returned the cannabis. Defendant denied having anything to do with the home invasion. He asked if the person who had been shot was living. Atteberry answered that the shooting victim had barely survived.

¶ 39         Atteberry showed defendant a photograph of the shooting victim, Kevin, and asked defendant if he recognized him. Defendant answered in the affirmative: it was a man he had known, since "way back in the day," as "Mississippi." Defendant was quite positive and emphatic about knowing this man. "I know him!" he exclaimed over and over again. Atteberry responded he was well aware that defendant and Kevin knew one another—and Atteberry added that when he laid out for Kevin the evidence he had just laid out for defendant, Kevin believed that defendant had been involved in the home invasion. Atteberry told defendant that he was of the same belief and that unless defendant began leveling with him, there was no point in dragging out the interview further, whereupon Atteberry left the interview room.

¶ 40         After a while, defendant knocked on the door (from the inside), and Arnold answered. Ascertaining from Arnold that he was the supervisor at the police station, he requested that Arnold have Atteberry return to the interview room because, as defendant put it, "I'm going to give them what they're looking for." When Atteberry returned, however, the only additional information that defendant gave him was that June's reason for coming to Bloomington was to appear in court for driving while his driver's license was suspended.

¶ 41                    F. Atteberry's Testimony Regarding Parks

¶ 42         Atteberry testified he had been informed by police in the Chicago area that Parks was a member of a rip-off crew, the *modus operandi* of which was arranging to buy drugs as a ruse to rob the drug dealer. In January 2017, Parks died in an encounter with the police.

¶ 43                    G. Cell Phone Records

¶ 44       1. *Communications Between Defendant's Phone and Parks's Phone on*

*November 8 and 9, 2016*

¶ 45       Atteberry testified to the call records in People's exhibit No. 26, an exhibit that was admitted without objection. The telephonic communications between defendant's phone number and Parks's phone number are highlighted in this exhibit.

¶ 46       The following communications occurred between defendant's phone and Parks's phone on November 8, 2016, the day before the home invasion: (1) a voice call from Parks to defendant at 8:36 a.m. that lasted 259 seconds, (2) a voice call from Parks to defendant at 3:10 p.m. that lasted 144 seconds, and (3) a voice call from defendant to Parks at 8:25 p.m. that lasted 503 seconds.

¶ 47       The following communications occurred between defendant's phone and Parks's phone on the day of the home invasion, November 9, 2016: (1) a voice call from Parks to defendant at 12:02 p.m. that lasted 53 seconds, (2) a text message from defendant to Parks at 12:05 p.m. and one second, (3) a text message from Parks to defendant at 12:05 p.m. and 37 seconds, (4) a voice call from defendant to Parks at 1:08 p.m. and 11 seconds that lasted 31 seconds, (5) a voice call from Parks to defendant at 1:08 p.m. and 50 seconds that lasted 41 seconds, (6) a voice call from Parks to defendant at 1:13 p.m. that lasted 25 seconds, (7) a voice call from Parks to defendant at 1:14 p.m. that lasted 24 seconds, (8) a voice call from defendant to Parks at 1:17 p.m. that lasted 38 seconds, (9) a voice call from defendant to Parks at 3:04 p.m. that lasted 28 seconds, (10) a voice call from Parks to defendant at 3:14 p.m. that lasted 27 seconds, (11) a voice call from defendant to Parks at 3:15 p.m. and 24 seconds that lasted 8 seconds, (12) a voice call from Parks to defendant at 3:15 p.m. and 37 seconds that lasted 55 seconds, (13) a voice call from Parks to defendant at 6:57 p.m. that lasted 6 seconds, (14) a voice call from defendant to Parks at 7:57 p.m.

that lasted 38 seconds, (15) a voice call from defendant to Parks at 8:16 p.m. that lasted 30 seconds, and (16) a voice call from defendant to Parks at 9:29 p.m. that lasted 8 seconds.

¶ 48    In a nutshell, defendant and Parks had three telephone conversations on November 8, 2016. They called or texted one another 12 times on November 9, 2016, before the incident, during the period of 12:02 p.m. to 3:15 p.m. Then they spoke on the phone three further times on November 9, 2016, after the incident, beginning at 7:57 p.m. (18 minutes after the 911 call).

¶ 49                            2. *A Historical Cell Site Analysis*

¶ 50    Greg Catey testified that he was a special agent with the Federal Bureau of Investigation (FBI). He was a member of the FBI's cellular analysis survey team, which specialized in determining where cell phones were located on specific dates and at specific times.

¶ 51    Using records from Sprint, Catey was able to determine the general area of Bloomington where defendant's cell phone was located when the phone was used from 7:19 p.m. to 7:38 p.m. on November 9, 2016. There was a cell tower, tower 2505, near Lincoln and Bunn Streets in Bloomington, less than 1,000 feet from the Powell residence. An outbound call was made from defendant's phone at 7:19 p.m. on November 9, 2016, and another outbound call from his phone was made a minute later. The numbers were called from defendant's phone, but it is not known to whom those numbers belonged. Those outbound calls of 7:19 p.m. and 7:20 p.m. on November 9, 2016, used sector 2 of tower 2505. Then, at 7:26 p.m., 7:37 p.m., and 7:38 p.m. on November 9, 2016, there were three incoming calls to defendant's phone, and those incoming calls used sector 3 of tower 2505. We know the numbers that called defendant's phone these three times but not to whom those numbers belonged. (As far as we know, the previous call that defendant had made to Parks was at 6:57 p.m. on November 9, 2016, and the next call from defendant to Parks

- 13 -

would be at 7:57 p.m. on November 9, 2016. The record does not appear to reveal with whom defendant was in telephonic contact in those interim five calls from 7:19 p.m. to 7:38 p.m.)

¶ 52 Tower 2505, Catey explained, was a three-sided tower, with antennas or panels on each of the three sides. The reason why the cell towers were made that way was to maximize their capacity for carrying phone traffic. The three sides of tower 2505 "sectorize[d]" the service area for that tower into three parts, like dividing a pie into three slices. Sector 1 sent out energy to the northeast (roughly speaking), sector 2 to the southeast, and sector 3 to the northwest. When a cell phone was powered on, it searched for the strongest and cleanest signal. If a cell phone was within the service area of tower 2505, the cell phone would decide which sector of that tower was transmitting the cleanest signal at the cell phone's location—sector one, sector two, or sector three—and the cell phone would lock onto that signal.

¶ 53 The records from Sprint for defendant's phone showed that when defendant's phone made the calls at 7:19 p.m. and 7:20 p.m. on November 9, 2016, it used sector 2 of tower 2505. When defendant's phone received the calls at 7:26 p.m., 7:37 p.m., and 7:38 p.m. on November 9, 2016, it used sector 3.

¶ 54 The question that needed answered, then, was what were the "actual" radio "footprint[s]" of sectors 2 and 3? In other words, what was the area of Bloomington where a cell phone would lock onto sector 2? And what was the area of Bloomington where a cell phone would lock onto sector 3? Catey determined the answers to those questions by driving up and down the streets around tower 2505 with a device that mimicked a cell phone.

¶ 55 In People's exhibit No. 24, Catey colored onto a map of Bloomington the coverage of sector 2 and the coverage of sector 3. Tower 2505, in this map, is a black dot, and sector 3 is an irregularly shaped aqua-colored puddle extending roughly 3,000 feet to the northwest of the tower.

(The map includes a distance ruler). Sector 2 is an irregularly shaped purple puddle extending roughly 6,000 feet to the southeast of the tower. The two puddles overlap at the bottom of sector 2 and the top of sector 3. In the overlap, less than 1,000 feet southwest from the tower, is the Powell residence, signified by a red icon. The Freedom gas station, signified by a blue icon, sits just outside sector 2, just beyond its western border. Combined, sectors 2 and 3 extend about 11,000 feet from north to south and about 11,000 feet east to west. (These distances are very approximate because the sectors are irregularly shaped. But this should give an adequate idea of the size of the sectors.) By our calculation, then, sectors 2 and 3 cover an area of about 4 square miles (11,000 feet is about 2 miles, and 2 times 2 equals 4).

¶ 56      Given that the calls made from defendant's phone at 7:19 p.m. and 7:20 p.m. on November 9, 2016, used sector 2 and the calls going to defendant's phone at 7:26 p.m., 7:37 p.m., and 7:38 p.m. on November 9, 2016, used sector 3, the prosecutor asked Catey if it were possible to infer that, during the period of 7:19 p.m. to 7:26 p.m., defendant's phone moved from the aqua-colored puddle of sector 3 southward to the purple puddle of sector 2. Catey answered that such an inference would be impossible for him to draw because there was an alternative possibility: during all five phone calls, defendant's phone could have been in the overlap between sectors 2 and 3, causing the phone to waver irresolutely between sectors 2 and 3, choosing one sector in one call and the other sector in another call.

¶ 57      In any event, in Catey's opinion, the records were consistent with defendant's phone's being in the vicinity of 1528 Julie Drive between 7:20 p.m. and 7:38 p.m. on November 9, 2016. But, in his opinion, the records were inconsistent with defendant's phone's being at the Freedom gas station between 7:20 p.m. and 7:38 p.m. on November 9, 2016.

¶ 58      On cross-examination, defense counsel asked Catey:

"Q. Your analysis does not say that any location is more likely than not except for within those sectors as indicated in the box, correct?

A. With one exception, sir. The call or the call separation is five minutes.

Q. Sure.

A. So, we have to assume if one call was carried in sector 2 and the other one was carried in sector 3, there's only a five-minute separation. So, where could an individual go within that five-minute period and still be in sector 2 and sector 3 five minutes later? So, like, for example, you were pointing earlier with your laser pointer up to Oakland at the top of sector 3, that would not be probable.

Q. Well, sir, for clarity, you don't know where this phone was in—if it was in a car or if it was on foot. You were not given that information. You are not analyzing that for these purposes, correct?

A. No, sir."

In other words, Catey's point was that there was only a five-minute separation, approximately, between the call in sector 2 at 7:20 p.m. on November 9, 2016, and the call in sector 3 at 7:26 p.m. on November 9, 2016. Therefore, it seemed unlikely to Catey that, at 7:20 p.m., defendant's phone was as far away as East Oakland Avenue, in the upper northeast region of sector 3. Rather, it seemed more reasonable to suppose that defendant's phone was closer to the overlap between sectors 2 and 3—the overlap in which the Powell residence was located—because there was so little time, a mere five or six minutes, to go from one sector to the other.

¶ 59                    H. Trial Counsel's Closing Argument

¶ 60          One of the charges against defendant, count I of the indictment, was attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2016)). At the conclusion of the bench trial, in

his closing argument to the circuit court, trial counsel maintained that the State had failed to prove count I, even on a theory of accountability, because if an experienced killer such as Parks had intended to kill Kevin, he surely would have succeeded. Trial counsel argued:

> "We know at least one of the people in this house, Jamal Parks, whom you've heard a lot about and I'll continue to reference his involvement here, was wanted for murder up north, ends up in a shoot out with police, maybe takes his own life. This man standing in front of Mr. Powell isn't missing if he wants to kill him."

Thus, trial counsel argued, regardless of who the other intruders were—and they could not have included defendant because he had no goatee, was heavy, and "ha[d] never worn skinny jeans in his life"—Parks was certainly one of the intruders. It was known that Parks was in the house and that he was among those who shot Kevin point-blank in the living room. Parks was an expert at killing people, and if he had intended to fire a fatal shot, he would have done so. The intruders had intended to torture Kevin into giving up his money, not to kill him. Thus, trial counsel contended, the charge of attempted first degree murder, on a theory that defendant was responsible for the intruders' conduct, was unproven.

¶ 61     Trial counsel further exploited Parks's notoriety by arguing that defendant's statement to the police was consistent with what Parks was known for. "This Jamal Parks guy, he rips people off," trial counsel noted. Counsel continued, "He is a rip-off crew guy. He is from Chicago. He came down here to get crap from you"—and if he did it to the Powells, he would have done it to defendant, too. The idea was that defendant left the pizza box behind in June's car, with his fingerprint on the box, when he bolted out of the car and ran after being pistol-whipped and robbed. Then the intruders used the pizza box as a prop in the home invasion.

¶ 62    "[W]e know where [the pizza box with defendant's fingerprint on it] came from," trial counsel argued, stating, "We have the surveillance video of the Casey's purchase where my client had it. His prints on the box. That ends up brought by the perpetrators to the home. But my client's contact with that ends well before then." Defendant's contact with the perpetrators ended, trial counsel suggested, when defendant was robbed in June's car, just as he recounted to the police: he was "robbed by a member of a rip-off crew, which fits the evidence perfectly."

¶ 63    Granted, defendant had denied that Parks (pictured in the photograph that Atteberry had showed him) was in the car, but, by trial counsel's reasoning, that did not matter: Parks, as the ringleader, could have bought the phone himself and then supplied it to his associate, June, to use as company equipment, so to speak. Trial counsel insisted that defendant's account of being robbed during a cannabis negotiation fit perfectly with what the police knew about Parks and his crew. "[W]e know what Jamal Parks was," trial counsel argued, and the robbery of defendant—before the robbers moved on to what they hoped would be a bigger haul at the Powell residence—was consistent with what the police had learned about Parks's criminal methodology. Counsel stated, "It's exactly how Atteberry describes these rip-off crews. The fact these rip-off crews will set up a deal and take it instead."

¶ 64                            I. The Findings of Guilt

¶ 65    The circuit court found defendant not guilty on count I of the indictment, the count charging him with attempted first degree murder (*id.*).

¶ 66    The circuit court found defendant guilty, however, on the remaining five counts of the indictment: specifically, counts II and III, which charged him with home invasion (*id.* § 19-6(a)(3)) (one count pertaining to Darla and the other count pertaining to Kevin); count IV, which charged defendant with armed robbery (*id.* § 18-2(a)(2)); count V, which charged him with

aggravated battery with a firearm (*id.* § 12-3.05(e)(1)); and count VI, which charged him with aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)).

¶ 67        J. The Circuit Court's Rationale for Finding Defendant Guilty on Counts II to VI

¶ 68        After taking the case under advisement and reviewing the evidence, the circuit court gave, orally from the bench, the following rationale for finding defendant guilty, beyond a reasonable doubt, on counts II to VI.

¶ 69        The circuit court "absolutely believe[d] and [was] convinced that Jamal Parks was present at the Powell[s'] home on November 9th, 2016." Defendant claimed he did not know Parks. And yet, on November 8, 2016, the day before the incident, there were three calls between defendant's phone and Parks's phone, and these were not short calls: the first call was 259 seconds, the second call was 144 seconds, and the third call was 503 seconds. On November 9, 2016, the day of the incident, there were 12 calls between defendant and Parks before the incident at the Powell residence and 4 calls between defendant's phone and Parks's phone after the incident. All of these phone calls led the court (1) to infer that Parks participated in the incident of November 9, 2016, and (2) to "seriously question the defendant's credibility" in his representation to the police that he was unacquainted with Parks.

¶ 70        For four additional reasons, the circuit court found defendant's explanation to the police to be unworthy of belief.

¶ 71        First, defendant represented to the police that on November 9, 2016, a mere five minutes after he bought the pizza at Casey's, June and another man pistol-whipped him, robbed him of his marijuana, and abducted him in a car. Supposedly, defendant's captors let him out at the Freedom gas station, meaning that they had driven west from Casey's. When defendant was let out of the car, he ran. But defendant's cell phone records showed that, an hour after he allegedly

was robbed of his marijuana, "he either stayed at the Freedom gas station," which was "at the very outside of the service area" (but he denied staying there; he said he ran), or "he ran back east to the area where he had just been beat up and robbed and hit with a pistol"—"which happen[ed] to put him at or near the location of the Powell[s'] home at the time of this incident occurring." If, instead, and more logically, defendant had run or walked north to his home, on Roosevelt Avenue, "he would have been way out of the cellphone service area that he was in at the time the incident at the Powell[s'] home took place." Even if he had walked west toward Market Street to Pop's Grocery Store, where he said he was before he went to Casey's, he likewise "would have been way outside of the cell service area that he was in at the time the incident at the Powell[s'] home took place." It struck the circuit court as unbelievable that defendant would have run "back to where he was just beat[en] up." It made no sense that he would flee to the vicinity of the Powells' home if, as he related to the police, that was the vicinity where he had just been robbed, beaten up, and abducted.

¶ 72    Second, defendant claimed that, after being robbed of his marijuana, "he called the phone registered to Jamal Parks" (whom defendant denied knowing) "to tell him that the next time he [saw] him, it [was] on, meaning that [he was] going to get revenge for [the] taking [of] the marijuana." The trouble was that "the first call after the defendant was allegedly beat[en] up and robbed between Parks'[s] and defendant's phone[s] was an incoming call from Jamal Parks'[s] phone." (Defendant bought the pizza from Casey's at 5:35 p.m. on November 9, 2016, and his first telephonic communication with Parks's phone after that purchase was at 6:57 p.m. on November 9, 2016.) The circuit court was skeptical that "somebody would beat up the defendant, rob him, [and] pistol whip him[ ] and [then] the next call would be an incoming call from the person who beat him up and robbed him."

¶ 73         Third, the timing of the calls from defendant to Parks seemed illogical to the circuit court, given defendant's story to the police. Defendant allegedly was robbed and beaten up at 5:40 p.m. on November 9, 2016. But it was not until 2 hours and 18 minutes later—approximately 30 minutes after the incident at the Powells' home—that defendant called Parks to tell him "it [was] on for robbing him and beating him up." Then, 30 minutes after making his initial call to Parks, defendant made another call to him—and yet another call to him 15 minutes later. "It [was] not credible to the court that the defendant would make three separate calls at these timeframes to Parks'[s] phone to simply tell him next time he sees him, [it was] on for stealing his pot."

¶ 74         Fourth, defendant's demeanor in the video-recorded interview at the police station made the circuit court doubt his credibility. Toward the end of the interview, defendant asked for a cigarette and said "something to the effect that he [was] going to give the detectives what they [were] looking for." It appeared as if defendant's story was about to change. But then, after he had smoked a cigarette, defendant "change[d] his mind, and the story [went] back to what was initially said to the detectives."

¶ 75         That defendant had told an unbelievable story to the police did not necessarily prove the State's case, in the circuit court's view. The State had to "put him at the scene or make him legally accountable for the actions of others." The court found "that the pizza box with the defendant's fingerprints [was] direct physical evidence of defendant's presence and accountability." There also was the surveillance video of him buying pizza from Casey's.

¶ 76         Admittedly, the Powells had been unable to "make a direct identification of the defendant." According to Kevin, all three men were wearing masks. But after viewing the surveillance video from Casey's, Kevin believed defendant to be one of the intruders because the clothing he saw in the house was the clothing defendant was wearing in the video.

¶ 77    Darla's description of the height and clothing matched that of defendant, even though her description of weight and facial hair did not fit him. Despite those discrepancies, there were "general descriptions that matched the defendant's clothing." Darla, whom the circuit court found to be credible, "stated that *** one of these individuals was dressed in all black, and the video clearly show[ed] that the defendant was dressed in all black at the time the alleged incident took place or the time that he was at the Casey's."

¶ 78    Another important piece of evidence, in the circuit court's analysis, was Darla's testimony that " '[t]he lighter skinned gentleman ran up the hallway and said, "Mac, somebody is in the basement." ' " Defendant's street name was Big Mack or Fat Mack.

¶ 79    Also, in a two-day period, November 8 and 9, 2016, there were lots of calls between defendant's phone and Parks's phone. Given Atteberry's description of Parks, he did not "sound like the type of individual who would let somebody use his phone for multiple calls or to buy a phone for somebody else." Instead, the "logical conclusion," in the circuit court's mind, was that "the defendant was talking with Jamal Parks the day before this incident took place and was planning the incident."

¶ 80    Both the call records and the historical cell site analysis weighed heavily against defendant, in the circuit court's assessment. It was true that "there [could] be differences in where a person [was] located with their cell phone within a cell service area." But the court concluded that "defendant was either in or right outside the Powell[s'] residence at the time this incident took place."

¶ 81    In sum, then, the circuit court was "convinced beyond a reasonable doubt that the defendant either participated directly or [was] guilty by way of accountability on Counts [II] through [VI] of the bill of indictment." Accordingly, the court found him to be guilty on those

counts. The court further found that Kevin—who, at the time of the trial, still could walk only with the assistance of a cane—had "suffered severe bodily injury."

¶ 82                                                    K. The Sentences

¶ 83        On count II (home invasion), the circuit court sentenced defendant to imprisonment for 25 years, ordering that this prison term run consecutively to the prison terms imposed on counts IV, V, and VI.

¶ 84        On count III (home invasion), the circuit court imposed no sentence.

¶ 85        On count IV (armed robbery), the circuit court sentenced defendant to imprisonment for 25 years, ordering that this prison term run consecutively to the prison terms imposed on counts II, V, and VI.

¶ 86        On count V (aggravated battery with a firearm), the circuit court sentenced defendant to imprisonment for 10 years, ordering that this prison term run consecutively to the prison terms imposed on counts II, IV, and VI.

¶ 87        On count VI (aggravated discharge of a firearm), the circuit court sentenced defendant to imprisonment for five years, ordering that this prison term run consecutively to the prison terms imposed on counts II, IV, and V.

¶ 88        Additionally, the circuit court ordered restitution in the amount of $80,498.70.

¶ 89                                                   L. The Posttrial Motion

¶ 90        After the findings of guilt, trial counsel moved for a judgment of acquittal or, alternatively, a new trial. At the hearing on this posttrial motion, trial counsel argued that Darla's testimony that she had heard one of the intruders address another as " 'Mack' " was "garbage." She had "never told anyone else that," trial counsel asserted, and her " 'Mack' " testimony "came in a non-responsive response [to the prosecutor's] question." Significantly, the prosecutor never

"followed up" on that testimony, either. "But they don't latch onto that as a statement of ID?" trial counsel asked rhetorically. No, they do not, because it was worthless, trial counsel implied. Instead, the prosecutor suggested in his closing argument that " 'maybe [defendant] was just the fourth guy in the car.' " The prosecutor did not even try to exploit what had obviously been Darla's "trying to help the State."

¶ 91        Trial counsel recounted:

"In the moment that Ms. Powell said, 'Mac,' I looked over to cocounsel. [']Is that what she just said? What happened there?['] Maybe I should have moved to strike it. Maybe I should have engaged with that more. Maybe I was ineffective by missing that. But it was a complete surprise. The State didn't build on it, and that should tell you something, Judge. Ms. Powell, with no fault of her own, was working for a conviction as she admitted on the stand. She wanted [defendant] to be convicted of this crime."

¶ 92        The prosecutor argued against the posttrial motion—not disputing, however, that the " 'Mack' " testimony was new information from Darla.

¶ 93        The circuit court then repeated, point by point, the rationale it had given at the conclusion of the bench trial for finding defendant guilty on counts II to VI. Given "the totality of the evidence," the court was still convinced, beyond a reasonable doubt, that "defendant either directly participated or was guilty by way of accountability for the incident that took place on November 9th, 2016." Therefore, the court denied the posttrial motion.

¶ 94                M. Dismissal of the Amended Petition for Postconviction Relief

¶ 95        One of the claims in defendant's *pro se* petition for postconviction relief was that trial counsel had rendered ineffective assistance by "fail[ing] to challenge the video statement by

a motion *in limine* either before or during trial." The *pro se* petition continued, "No request was made by trial counsel to have the trial judge conduct a balancing test to determine whether the video statement by [defendant] was admissible by weighing the relevance against the risk of unfair prejudice and possible misuse by the State." "Furthermore," the *pro se* petition added, "any potential forfeiture, waiver or procedural default of any of the issues raised in this petition stem from the ineffectiveness of trial and/or appellate counsel."

¶ 96    The circuit court appointed postconviction counsel, who filed an amended petition. Unlike the *pro se* petition, the amended petition did not criticize trial counsel for failing to request "a balancing test to determine whether the video statement by [defendant] was admissible." Nor did the amended petition allege ineffective assistance by appellate counsel.

¶ 97    The only claim in the *pro se* petition that the amended petition included was that trial counsel had rendered ineffective assistance by failing to impeach Darla with her prior statements to the police. Judging by police reports attached to the amended petition, Darla never mentioned to the police that one of the intruders had addressed another as " 'Mack.' " In fact, in one of the statements she made to the police, she specifically denied having heard any name. The amended petition criticized trial counsel for failing to impeach Darla with these police reports after she testified, at the bench trial, that one of the intruders said, " [']Mack, somebody is in the basement.['] "

¶ 98    The State moved for dismissal of the amended petition because, first, impeaching Darla with the police reports would have had no tendency to undermine the circuit court's alternative finding of guilt by accountability. As the State put it:

> "There is nothing about Darla Powell's testimony that could undo the fact that, even if he was not in the home, the Defendant was legally accountable for the conduct

that occurred within the home. The Court's ruling expressly found that the Defendant was guilty either because he directly participated or by way of accountability."

¶ 99　　　Second, the State argued that Darla's " 'Mack' " testimony was only one item of evidence and that impeaching her would not have cured the implausibility of defendant's statement, nor would it have erased the fingerprints on the pizza box or invalidated the cell phone records and the historical cell site analysis—all of which negated any reasonable probability that impeaching Darla with the police reports would have yielded an acquittal.

¶ 100　　　Third, as trial counsel pointed out at the posttrial hearing, it already was inferable, from the record of the bench trial, that Darla's " 'Mack' " testimony had come as a surprise to the prosecutor and that Darla, therefore, must not have previously told the police that she had heard one of the intruders utter defendant's nickname. Otherwise, the police would have passed that information along to the prosecutor, who then would have made deliberate and prominent use of it in his direct examination of Darla and in his closing argument. Nevertheless, even after trial counsel noted, at the posttrial hearing, the apparent newness of this revelation, the circuit court found no grounds for a new trial.

¶ 101　　　The circuit court granted the State's motion to dismiss the amended petition for postconviction relief.

¶ 102　　　This appeal followed.

¶ 103　　　　　　　　　　　II. ANALYSIS

¶ 104　　　　　　　　　　A. Omitted Impeachment

¶ 105　　　At the second stage of a postconviction proceeding, the amended petition should survive the State's motion for dismissal only if the amended petition and its accompanying

documentation make a substantial showing of a constitutional violation. See *People v. Domagala*, 2013 IL 113688, ¶ 33. We decide *de novo* whether that showing was made (see *People v. Urzua*, 2023 IL 127789, ¶ 28), taking as true "all well-pleaded facts that are not positively rebutted by the original trial record." (Internal quotation marks omitted.) *Domagala*, 2013 IL 113688, ¶ 35.

¶ 106      The amended petition claimed that trial counsel had rendered ineffective assistance. Under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), a criminal defendant has the right to counsel, and this right to counsel includes the right to effective, or competent, representation by the counsel. *People v. Boose*, 2025 IL App (4th) 231467, ¶ 30; *People v. Olsen*, 2023 IL App (4th) 220738-U, ¶ 32.

¶ 107      One of the errors by trial counsel that amounted to ineffective assistance, according to the amended petition, was his failure to impeach Darla with the police reports. Judging by the police reports, Darla never told the police that one of the intruders had addressed another as " 'Mack.' " She even affirmatively denied to the police that she had heard any of the intruders utter a name. By contrast, at the bench trial, Darla testified that one of the intruders had said, " [']Mack, someone is in the basement.['] " Defendant criticizes trial counsel for failing to react to that testimony by impeaching Darla with her prior inconsistent statement.

¶ 108      "[W]hether and how to conduct cross-examination," such as by impeaching the witness, is a matter of strategy (internal quotation marks omitted) (*People v. Clendenin*, 238 Ill. 2d 302, 319 (2010)), and the supreme court has held, "[M]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent. [Citation.] The only exception to this rule is when counsel's chosen trial strategy is so unsound that counsel entirely

fails to conduct any meaningful adversarial testing." (Internal quotation marks omitted.) *People v. West*, 187 Ill. 2d 418, 432-33 (1999).

¶ 109      "Strategy" is "the art of devising or employing plans or methods toward a goal." Merriam-Webster's Collegiate Dictionary 1233 (11th ed. 2020). Failing to perceive an opportunity for impeachment is not, properly speaking, strategy—not even inartful strategy. Rather, it is, in the moment, a failure to strategize. "[M]issing that," as trial counsel put it, was not a tactical misjudgment. It was simply a mistake, a lapse, an oversight, that cannot plausibly be made out to be a strategic decision. "Strategic choices" deserve great deference. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 62. Failure to react fast enough deserves no deference. The holding from *West*, therefore, is inapplicable, and we use the traditional analysis from *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 110      There are, as we have already intimated, two elements to a claim of ineffective assistance under *Strickland*: (1) an act or omission by counsel that was outside the wide range of professionally reasonable assistance and (2) resulting prejudice. See *id.* at 687. It is not enough that counsel made a mistake; the mistake must have caused prejudice to the defense. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "[A] court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient." *People v. Johnson*, 2021 IL 126291, ¶ 53. We will go straight to the element of prejudice.

¶ 111      Defendant argues that the evidence in the case was "closely balanced" and that missing the opportunity to impeach Darla with the police reports "potentially changed the

outcome of" the case. Apart from her " 'Mack' " testimony, defendant reasons, "there were only two pieces of substantively admissible evidence that suggested [he] was involved in the robbery:" (1) the pizza box with defendant's and Parks's fingerprints on it, which was left behind in the residence, and (2) the phone records "show[ing] that [defendant] called Parks several times around the time of the robbery."

¶ 112       Defendant could be understood as implying that the only evidence that counts is evidence which is "substantively admissible." However, "[a] rule of evidence not invoked by timely objection is waived," and "evidence *** admitted without objection is to be considered and given its natural probative effect." *People v. Akis*, 63 Ill. 2d 296, 299 (1976).

¶ 113       Having set aside any concern about substantive admissibility in the absence of a relevant, preserved objection, we take issue with defendant's premise that, other than Darla's " 'Mack' " testimony, the pizza box and the phone records were the only evidence against him. There also was the historical cell site analysis showing that, during or immediately after the incident, defendant's phone was in the vicinity of the Powell residence—"blow[ing] up" Parks's phone, as Atteberry put it. There also was defendant's statement to the police, which, for the reasons the circuit court explained at the conclusion of the bench trial, could be regarded as containing falsehoods. If defendant lied to the police, his having done so has probative value. The reason why he lied, it could be inferred, was that he knew he was guilty and was resorting to deceit to try to escape criminal liability for his conduct. See *Walker*, 2020 IL App (4th) 180774, ¶ 93.

¶ 114       Evidently, one thing defendant told the truth about was his acquaintance with Kevin. A rip-off crew arrived from Chicago, and out of Bloomington's population of 78,000, the house the rip-off crew chose to strike was that of someone defendant knew. The day before and

the day of the home invasion, defendant's phone communicated numerous times with the phone of the ringleader of the rip-off crew, although the two phones had never communicated with one another before. The fingerprints of defendant and the ringleader were found on a pizza box that the intruders left behind in the house.

¶ 115 Defendant contends that although his and Parks's fingerprints were found on the Casey's pizza box that the intruders used as a prop to gain entry into the Powell residence and although a video from Casey's showed defendant buying a box of pizza about an hour before the intruders knocked on the Powells' door, those facts can support only "a very weak inference" that defendant was "involved in the robbery." It is unproven, defendant argues, that the pizza box the intruders used was the same pizza box he carried out in the surveillance video—he "could have touched more than one pizza box while he was in Casey's." For that matter, defendant maintains, he could have eaten the pizza and thrown away the box, and, without his knowledge or instigation, the intruders could have come along and picked up the box to use it for their own nefarious ends. Thus, defendant concludes, his fingerprint on the pizza box does little to connect him to the crimes committed in the Powell residence.

¶ 116 In his closing argument at the bench trial, however, trial counsel—as defendant's agent—admitted that the pizza box the surveillance video showed defendant buying at Casey's and on which he and Parks left their fingerprints was the same pizza box the intruders left behind in the Powell residence. See *Allen v. United States Fidelity & Guaranty Co.*, 269 Ill. 234, 241 (1915) ("Attorneys are deemed agents of their clients for the purpose of making admissions in all matters relating to the *** trial of an action. Such admissions are treated as the admissions of the client."). Again, we quote trial counsel's closing argument to the circuit court: "So pizza box with a fingerprint. And we know where that came from. We have the surveillance video of the

Casey's purchase where my client had it. His prints are on the box. That ends up brought by the perpetrators to the home." So, if the court erred by finding that the pizza box left behind in the residence was the same pizza box that defendant had bought at Casey's (we disagree, though, that such a finding was erroneous), defendant invited the court to make the error and, thus, is judicially estopped from challenging the error. See *People v. Harvey*, 211 Ill. 2d 368, 385 (2004); *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). If, with defendant's encouragement, the court makes a certain finding, defendant cannot afterward claim, on appeal, that the finding is unjustified.

¶ 117　　　Also, in his closing argument, trial counsel invited the circuit court to find that Parks was in the Powell residence. Trial counsel remarked to the court, "We know at least one of the people in the house, Jamal Parks, whom you've heard a lot about and I'll continue to reference his involvement here, was wanted for murder up north." Now, in this appeal, defendant turns around and argues, "[T]here was no evidence that Parks was anywhere in the immediate area when the Powells were robbed" (to quote his reply brief). Because defendant, however, through his attorney, encouraged the court to find that Parks was one of the intruders, defendant is judicially estopped from challenging that finding. See *Harvey*, 211 Ill. 2d at 385; *Swope*, 213 Ill. 2d at 217.

¶ 118　　　We take it as beyond question, then, that Parks was in the house and that the pizza box on which he and defendant left their fingerprints was the pizza box that defendant had carried out of Casey's. Tying Parks to the house ties defendant to the house, for both of their fingerprints were on the pizza box, and their phones were in communication the day before the incident and the day of the incident. More specifically, their phones were in communication minutes after the incident, if not during the incident. Defendant's fingerprint on the prop, the

calls between defendant's phone and Parks's phone around the time of the home invasion whereas there had never been any calls between their phones before, defendant's positioning himself near the Powell residence and "blow[ing] up" Parks's phone immediately after the shooting, defendant's prior acquaintance with Kevin, and the apparent falsehoods that defendant told the police: all these circumstances are compelling evidence that defendant aided or encouraged the home invasion (see 720 ILCS 5/5-2(c) (West 2016))—and that is without Darla's " 'Mack' " testimony. Her " 'Mack' " testimony tended to suggest that defendant was present in the house, but he did not have to be present in the house to aid or encourage the home invasion.

¶ 119        So, we agree with the State that, "[g]iven all the evidence against defendant and his obvious lies to the police," which showed his consciousness of guilt, the amended petition failed to show that defendant suffered prejudice from the failure to impeach Darla with the police reports. Darla's " 'Mack' " testimony was only one strand of a web of incriminating evidence in which defendant was entangled, and removing that strand would not have significantly weakened the web. We conclude, *de novo*, that defendant suffered no prejudice from the omitted impeachment. See *Urzua*, 2023 IL 127789, ¶ 28. Without a showing of prejudice, there is no substantial showing of ineffective assistance. See *Strickland*, 466 U.S. at 687.

¶ 120                B. Hearsay in the Police Interview of Defendant

¶ 121        In his *pro se* petition, defendant claimed as follows:

"Trial counsel failed to challenge the video statement by a motion *in limine* either before or during trial.

No request was made by trial counsel to have the trial judge conduct a balancing test to determine whether the video statement by [defendant] was

- 32 -

admissible by weighing the relevance against the risks of unfair prejudice and possible misuse by the State."

¶ 122    Under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), postconviction counsel had a duty to "ma[k]e any amendments to the petitions filed *pro se* that [were] necessary for an adequate presentation of [defendant's] contentions." Postconviction counsel's certificate pursuant to Rule 651(c) raises a presumption that postconviction counsel fulfilled the duties listed in that rule, including the duty of making necessary amendments to the *pro se* petition, but defendant may rebut the presumption by affirmatively showing, from the record, that postconviction counsel did not substantially fulfill those duties. See *Urzua*, 2023 IL 127789, ¶ 54.

¶ 123    Defendant criticizes postconviction counsel, in his drafting of the amended petition, for "abandon[ing] *** the claim that trial and appellate counsel were ineffective for failing to challenge the substantive use of several statements made by detectives during [defendant's] video recorded interrogation." Specifically, Atteberry asserted to defendant, during the interview, that (1) Parks ran a rip-off crew in Chicago and (2) Parks was identified as being a participant in the home invasion. According to defendant, postconviction counsel should have written into the amended petition a claim that trial counsel rendered ineffective assistance by failing to make hearsay objections to those two statements by Atteberry in the video-recorded interview.

¶ 124    As the State points out, however, postconviction counsel could have had a duty to write that claim into the amended petition only if that claim was, to begin with, one of the *pro se* claims. Under *People v. Pendleton*, 223 Ill. 2d 458, 475-76 (2006), postconviction counsel was

required to put *defendant's* claims in the correct legal form. Postconviction counsel was not required to raise additional claims that defendant never raised *pro se*. See *id.*

¶ 125 The first question to ask, then, is this: Has defendant made an affirmative showing, from the record, that he originally raised, *pro se*, a claim that trial counsel rendered ineffective assistance by failing to make hearsay objections to the two assertions by Atteberry in the video? In the above quotation from the *pro se* petition, the State sees no reference to hearsay assertions by Atteberry, nor do we.

¶ 126 In his reply brief, defendant counters that, in his *pro se* petition, which should have been construed liberally, he was "not required to advance legal arguments or cite to legal sources" and that "[t]he minor differences between the claim raised in [defendant's] *pro se* petition and the claim argued here pertains solely to the precise legal theory under which trial counsel erred."

¶ 127 It is true that, in his *pro se* petition, defendant did not have to make a legal argument. Nevertheless, he did so. In his *pro se* petition, he chose to assert a legal theory, and that legal theory was his claim. The "balancing test" to which he referred ("a balancing test to determine whether the video statement by [defendant] was admissible by weighing the relevance against the risks of unfair prejudice and possible misuse by the State") was an allusion to Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), which provides as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This balancing test presupposed that the video, but for the listed dangers, would be substantively admissible, *e.g.*, that it would not be inadmissible hearsay. The "balancing test permits court to exclude *otherwise*

- 34 -

*admissible*, relevant evidence if, *inter alia*, 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.' " (Emphasis added.) Michael H. Graham, 3 Handbook of Federal Evidence § 413:1 n.7 (10th ed. 2025 Update) (quoting Fed. R. Evid. 403). If the video were inadmissible on the grounds of hearsay, a balancing test under Rule of Evidence 403 would have been superfluous. Therefore, the hearsay claim that defendant accuses postconviction counsel of abandoning is significantly different from the actual claim that defendant made in his *pro se* petition, and, as the supreme court held in *Pendleton*, postconviction counsel is not required to raise additional claims. See *Pendleton*, 223 Ill. 2d at 475-76.

¶ 128        Even if the hearsay claim were a preexisting *pro se* claim, fulfillment of the amendment duty under Rule 651(c) " 'does not require postconviction counsel to advance frivolous or spurious claims on defendant's behalf.' " *People v. Endicott*, 2025 IL App (5th) 230438, ¶ 33 (quoting *People v. Greer*, 212 Ill. 2d 192, 205 (2004)). " '[I]f amendments to a *pro se* postconviction petition would only further a frivolous or patently nonmeritorious claim, they are not "necessary" within the meaning of the rule.' " *Id.* (quoting *Greer*, 212 Ill. 2d at 205).

¶ 129        It would have been untenable for postconviction counsel to characterize as ineffective assistance trial counsel's decision to let into evidence Atteberry's assertion, in the interview, that Parks was the ringleader of a rip-off crew and that he was involved in the home invasion, for it was evident that trial counsel was strategizing. He had two purposes in letting in that evidence: (1) to make defendant's story of having been robbed—and, incidentally, dispossessed of the pizza box with his fingerprint on it—more credible than the story otherwise would have been and (2) to win an acquittal on the count of attempted first degree murder because a ruthless killer such as Parks would have succeeded in killing Kevin Powell if he had so

intended. In hindsight, defendant might think that the risks of that twofold strategy far outweighed its potential benefits. Probably any strategy in this case, however, would have had a downside, and second-guessing strategic decisions by counsel is exactly what case law cautions us against doing. See *People v. Manning*, 241 Ill. 2d 319, 335 (2011) ("Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable.").

¶ 130　　　　　When strategy is at issue, the supreme court's teaching is clear: a strategic decision by counsel is unassailable unless "counsel's chosen trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial testing." (Internal quotation marks omitted.) *West*, 187 Ill. 2d at 432-33. It would have been frivolous of postconviction counsel to claim, in the amended petition, that trial counsel's strategy of letting in this hearsay had *entirely* failed to subject the State's case to *any* meaningful adversarial testing. Trial counsel used Atteberry's words to buttress defendant's story of having been robbed and to cast reasonable doubt on count I. Because there was some discernable logic in refraining from making the hearsay objections, the *pro se* claims (supposing they existed) were frivolous claims that postconviction counsel rightly abandoned, and the presumption of his compliance with the amendment duty in Rule 651(c) is, therefore, unrebutted. See *Urzua*, 2023 IL 127789, ¶ 54.

¶ 131　　　　　　　　　　　　III. CONCLUSION

¶ 132　　　　　For the reasons stated, we affirm the circuit court's judgment.

¶ 133　　　　　Affirmed.